```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------
STEPHEN BEACH,                             :
                                           :
                          Plaintiff,       :    17cv5153
                                           :
              -against-                    :    OPINION & ORDER
                                           :
HSBC BANK USA, N.A.,                       :
                                           :
                          Defendant.       :
------------------------------------------------
```

WILLIAM H. PAULEY III, Senior United States District Judge:

        HSBC Bank USA, N.A. ("HSBC") moves for summary judgment dismissing Stephen Beach's action for breach of contract and declaratory judgment. For the following reasons, HSBC's motion is granted in part and denied in part.

## BACKGROUND

        On January 5, 2015, Beach started employment as HSBC's United States Head of Regulatory Compliance, Asset Management. (Pl.'s Statement of Undisputed Material Facts, ECF No. 51 ("Pl.'s Rule 56.1"), ¶¶ 1, 5; Decl. of Stephen Beach in Opp. ("Beach Decl."), ECF No. 48, Ex. 1 ("Employment Agreement").) HSBC terminated him on February 13, 2017. (Pl.'s 56.1 ¶ 20.) Under the terms of his Employment Agreement, Beach earned $240,000 per year, plus bonus incentives. (Pl.'s Rule 56.1 ¶ 6.) Those bonus incentives are the subject of this dispute.[1]

---

[1] Beach originally sought payment of the 2015 Bonus Shares and certain Retention Shares, but withdrew those claims. (See Pl. Stephen Beach's Opp. to Def. HSBC Bank USA, N.A.'s Mot. for Summ. J., ECF No. 50 ("Opp."), at 17 n.4.)

I. The 2014 Bonus Shares

Beach's Employment Agreement provided for a "guaranteed bonus," to be paid at the same time as any discretionary bonuses, which were typically granted in March following the plan year. (Employment Agreement at 000040.) In March 2015, HSBC granted Beach a guaranteed $120,000 bonus in the form of $108,000 in cash and $12,000 worth of restricted HSBC stock (the "2014 Bonus Shares"). (Pl.'s Rule 56.1 ¶¶ 8, 15–16; Employment Agreement at 000040.) The 2014 Bonus Shares were granted under and subject to the 2011 HSBC Share Plan (the "2011 Share Plan"), and were scheduled to vest in three installments: 33% on March 14, 2016, 33% on March 14, 2017, and 34% on March 14, 2018. (Pl.'s Rule 56.1 ¶¶ 17–18.)

However, that guaranteed bonus was "subject to satisfactory performance," and would be forfeited "where, prior to or on the relevant bonus payment date, [Beach] ha[d] resigned from employment . . . or ha[d] been terminated for cause." (Employment Agreement at 000040.) The Employment Agreement defined "cause" to mean that Beach "(iv) engaged in conduct that materially violated HSBC's internal policies or procedures; . . . or (viii) breached the obligations as set forth in this agreement or materially failed to perform required duties as an employee of HSBC." (Employment Agreement at 000041 (quotation marks omitted).) Beach received the first "tranche" of the 2014 Bonus Shares, but not the second and third, because they did not vest prior to his termination on February 13, 2017. (Pl.'s Rule 56.1 ¶¶ 19–20.)

II. The Incentive to Join Share Award

In addition to the guaranteed bonus and any discretionary bonuses, HSBC agreed to grant Beach an "Incentive to Join Share Award," in which it would "recommend [Beach] for an exceptional one-off allocation of HSBC . . . ordinary $0.50 shares to the value of USD $104,587.00." (Employment Agreement at 000041.) The Incentive to Join Share Award was

"subject to the terms of the HSBC Share Plan in force from time to time." (Employment Agreement at 000041 (alterations omitted).)

The Incentive to Join Share Award stated: "Subject to the terms of the [2011 Share] Plan, the Incentive to Join Share Award shall grant as soon as practicable following the Commencement Date and will vest in these proportions, 33%, 33% and 34% on each subsequent anniversary from the date of the grant." (Employment Agreement at 000041.) However, "any installment of the Incentive to Join Share Award w[ould] not vest where, prior to or on the relevant vesting date, [Beach] ha[d] resigned from employment . . . or ha[d] been terminated for cause." (Employment Agreement at 000041.) The Employment Agreement defined "cause" in the same way as the 2014 Bonus Shares: if Beach "(iv) engaged in conduct that materially violated HSBC's internal policies or procedures; . . . or (viii) breached the obligations as set forth in this agreement or materially failed to perform required duties as an employee of HSBC." (Employment Agreement at 000042.)

On May 11, 2015, HSBC granted Beach the Incentive to Join Share Award, subject to the three-year vesting period described above. (Pl.'s Rule 56.1 ¶ 24.) The first tranche vested on May 4, 2016, and Beach received those shares. (Pl.'s Rule 56.1 ¶ 26.) Beach now seeks to receive the second and third tranches.

III. The 2011 Share Plan

Employee share awards of HSBC stock, including the two awards subject to this dispute, are granted to employees under HSBC's 2011 Share Plan. (Pl.'s Rule 56.1 ¶ 28.) Rule 1.2 of the 2011 Share Plan states that HSBC may grant an award of HSBC stock "in accordance with any selection criteria that the Directors in their discretion may set." (Aff. of Allan S. Bloom ("Bloom Aff."), Ex. K (the "2011 Share Plan") ¶ 1.2.) In addition, Rule 1.3.1 of the 2011 Share

3

Plan states that "[a]wards may only be granted within 42 days starting on any of the following: (i) the date of shareholder approval; (ii) the day after the announcement of the Company's results for any period; [or] (iii) any day on which the Directors resolve that exceptional circumstances exist which justify the grant of Awards." (2011 Share Plan ¶ 1.3.1.) The date of shareholder approval occurred before Beach's commencement date, so the only possible options available were options (ii) or (iii). (See 2011 Share Plan at HSBC 000135 ("Shareholders' Approval: 27 May 2011.")

HSBC argues that Rule 1.2 allows it to choose option (ii), and that since it released its annual financial results for 2014 at the end of February 2015, it could not have granted Beach the Incentive to Join Share Award on a date that would have resulted in its vesting before Beach's termination. (Mem. of Law in Supp. of HSBC's Mot. for Summ. J., ECF No. 35 ("Mot."), at 17.) HSBC further argues that option (iii) is inapplicable because there were no "exceptional circumstances." Beach counters that HSBC could have exercised option (iii) to ensure compliance with the "as soon as practicable" language of the Employment Agreement.

IV. Beach's Job Performance

There are three grounds that HSBC claims support Beach's "for cause" termination: (1) his poor communication and failure to attend meetings and training in 2015; (2) his failure to properly respond to two data breaches in late 2016; and (3) an investigation spurred by a complaint from Beach's subordinate that found that Beach was a poor manager.

The first "for cause" ground for termination stems from Beach's 2015 mid-year performance review. Around that time, Beach's superiors discussed his allegedly poor

4

communication and his failure to attend training and meetings. (Bloom Aff., Ex. O.)[2]  However, they believed Beach was "on track" with his peers and was a "good" employee. (Bloom Aff., Ex. O.)  The parties dispute what was ultimately discussed in Beach's 2015 year-end review.

HSBC contends that Beach failed to respond appropriately to two data breaches. In October 2016, HSBC's Rapid Emergency Action Crisis Team ("REACT") notified Beach that one of his direct reports sent an internal email to a personal email address. (Pl.'s Rule 56.1 ¶¶ 77, 79.) REACT "requested that [Beach] address the identified violation with [the direct report] and respond to [REACT's] email." (Pl.'s Rule 56.1 ¶ 79.) However, Beach did not respond to REACT's initial email or follow-up emails until December 9, 2016. (Pl.'s Rule 56.1 ¶¶ 80–82; Beach Decl. ¶ 34.) In addition, REACT notified Beach of a second data breach on November 15, 2016, and Beach acknowledges that he "missed" that email (Pl.'s Rule 56.1 ¶¶ 86, 87–88.) As a consequence of these data breaches, HSBC placed Beach on "written performance warning" on January 9, 2017, which cautioned Beach that his "repeated failure to deal with these issues and respond to REACT is unacceptable. . . . Future issues of poor judgment, dishonest communication, or failure to follow HSBC policies or standards may lead to further corrective action, up to and including termination of employment." (Pl.'s Rule 56.1 ¶¶ 92-93.)

Beach's 2016 year-end performance review was mixed. It stated that Beach was "exceptionally knowledgeable when it comes to the regulations . . . [but t]he shortfall is performance management within his team . . . . We need to see considerable improvement in this area immediately." (Bloom Aff., Ex. W at HSBC 000056.) However, his "behavioral rating" was listed as "developing." (Pl.'s Rule 56.1 ¶ 94.) Though Beach disputes this point, HSBC

---

[2] Beach argues that this email constitutes inadmissible hearsay. But it is admissible for the non-hearsay purpose of demonstrating HSBC's state of mind. Moreover, HSBC can provide witnesses who can testify about their views on Beach's job performance as of this time period. See Fed. R. Civ. P. 56(c).

5

claims "developing" is the second-lowest behavioral rating and that it is a "poor rating." (Pl.'s Rule 56.1 ¶ 94 & Response.)

The third ground for termination arose from a complaint lodged by one of Beach's direct reports. (Pl.'s Rule 56.1 ¶¶ 96, 100–103.) Based on that complaint, and while Beach was out on vacation, Mary Brown—one of Beach's superiors—met with Beach's direct reports without his knowledge. (Beach Decl. ¶ 36.) Brown conceded that Beach should have been advised of such a meeting. (Decl. of Christopher P. Milazzo, ECF No. 49, Ex. 5 ("Brown Dep. Tr."), at 204:5–10.) Beach states that he confronted Brown about the meeting, and she denied having it. (Beach Decl. ¶ 37.) At that meeting, a direct report complained about Beach's management and offered to prepare a slide deck for Brown discussing ways the team could improve. (Beach Decl. ¶ 37; Brown Dep. Tr. at 204:13–22, 206:20–23.) Based on the slide deck, the matter was referred to HSBC's Employer Relations Group, which commenced an investigation on January 12, 2017. (Pl.'s Rule 56.1 ¶¶ 96, 99–105.) Interviews were conducted with Beach, seven of his direct reports, and a senior executive. (Decl. of Rhonda Toft, ECF No. 39 ("Toft Decl.") ¶ 8.) As a result of that investigation, Human Resources and Employee Relations recommended that HSBC terminate Beach. (Pl.'s Rule 56.1 ¶¶ 113, 115.)

V.  Beach's Termination

On February 7, 2017, Beach's superiors met to discuss Human Resources and Employee Relations' recommendation and agreed with its conclusion. (Pl.'s Rule 56.1 ¶ 115.) Accordingly, HSBC terminated Beach on February 13, 2017. (Pl.'s Rule 56.1 ¶ 121.)

The parties dispute the reasons for Beach's termination. HSBC states that Beach was terminated due to his "prior performance warning for failure to address the multiple data breaches on his team and the result[s] of the investigation"; Beach argues that those reasons are

6

pretextual, mainly because HSBC was undergoing budget cuts. (Pl.'s Rule 56.1 ¶ 114 & Response.)  Indeed, "[t]he budget for HSBC's compliance department was reduced by approximately $5,000,000 from 2016." (Pl.'s Rule 56.1, Statement of Additional Facts ¶ 6.)

It is undisputed, however, that during Beach's termination meeting on February 13, 2017, HSBC provided Beach with a "corrective action termination form," which stated that certain incidents complained about by a subordinate were corroborated by its investigation and that Beach "undermined the purpose" for a performance warning/corrective action issued to another one of Beach's direct reports. (Pl.'s Rule 56.1 ¶ 122.)  It further stated that those "examples of the management of your employees, in addition to the issues in the Performance Warning you were placed on January 9th, 2017, show a lack of proper judgment on your part and have caused your management to lose trust in your ability to lead.  As a result of your pattern of poor judgment and ineffective leadership, your employment is being terminated effective immediately." (Pl.'s Rule 56.1 ¶ 22; Bloom Aff., Ex. DD at HSBC 000072.)

Ultimately, HSBC argues that Beach violated various HSBC policies and procedures, including its Positive Work Environment Policy, its Statement of Business Principles, and HSBC's Values.  (Toft Decl. ¶ 11; Mot. at 14.)  The Corrective Action Form provided to Beach on his termination recited certain provisions of these policies, while also setting forth the formal reasons for Beach's termination.

First, the Positive Work Environment policy states that employees must "[m]aintain respectful and professional standards of behavior at all times." (Bloom Aff., Ex. DD at HSBC 000071; Bloom Aff., Ex. EE at HSBC 000117.)  Second, HSBC's Cultural Transformation Values state that employees should "take personal accountability for actions, behaviors, and delivery as expected" and "show initiative while balancing personal judgment

7

with company policy and compliance." (Bloom Aff., Ex. DD at HSBC 000071.) Finally, the Corrective Action Form cites a provision of the Statement of Business Principles, which discusses accommodating individuals within various protected classes and discusses anti-discrimination and harassment policies. (See Bloom Aff., Ex. DD at HSBC 000071.) As HSBC points out, this policy is likely related to a potential issue regarding sexual orientation discrimination, but HSBC does not explain whether these allegations were corroborated, and the Corrective Action Form, which lists the formal reasons for Beach's termination, does not mention that conduct. (See Bloom Aff. Ex., DD; Mot. at 12.)

As a result of Beach's termination, which HSBC determined was "for cause," he did not receive the last two tranches of the 2014 Bonus Shares and the Incentive to Join Share Award.

## DISCUSSION

I. Standard

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Baez v. JetBlue Airways Corp., 793 F.3d 269, 274 (2d Cir. 2015) (quotation marks omitted). This Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists . . . ." Rodriguez v. City of New York, 72 F.3d 1051, 1060–

61 (2d Cir. 1995). If the moving party meets its burden, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 249 (citation and quotation marks omitted). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation and alterations omitted). Indeed, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

Summary judgment is proper "where a defendant . . . reveal[s] that the plaintiff cannot establish an essential element of the claim, on which element the plaintiff has the burden of proof, and the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on that element." In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 509 (2d Cir. 2010) (citation omitted). "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (quotation marks omitted). "[N]othing in the rules or the case law requires a court to strike any portion of . . . [a Rule 56] affidavit that is not properly supported. A court may decline to conduct a line-by-line analysis and instead simply disregard the allegations that are not properly supported." Sauerhaft v. Bd. of Educ. of Hastings-on-Hudson

Union Free Sch. Dist., 2009 WL 1576467, at *8 (S.D.N.Y. June 2, 2009). As such, because "this Court has not relied upon any evidence submitted that is not supported or admissible," "it sees no need to strike any portions of [HSBC's] evidence." Mergers & Acquisition Servs., Inc. v. Eli Glob., LLC, 2017 WL 1157132, at *16 (S.D.N.Y. Mar. 27, 2017).

II. Breach of Contract

Beach claims that HSBC breached the Employment Agreement by failing to pay out the second tranche of the Incentive to Join Share Award. (Compl. ¶¶ 53–58.) He argues that the Incentive to Join Share Award was not granted "as soon as practicable," and that it should have been granted no later than January 31, 2015, meaning that the second tranche would have vested before his termination date. (Opp. at 15.) But Beach concedes that he contrived the January 31, 2015 date. (See July 26, 2018 Oral Arg. Tr., ECF No. 60 ("Oral Arg. Tr."), at 15:10–24.) HSBC counters that it could not have granted the Incentive to Join Share Award on a date which would have resulted in its vesting before Beach's termination because HSBC was in a "closed period" until after it issued its annual financials on February 23, 2015, and, in fact, it did not grant a restricted share award to any employee until March 2015. (Decl. of Urszula Guzik, ECF No. 37 ("Guzik Decl.") ¶¶ 12–13; Mot. at 16.)

The elements for breach of contract are: "'(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach.'" Can't Stop Prods., Inc. v. Sixuvus, Ltd., 295 F. Supp. 3d 381, 400 (S.D.N.Y. 2018) (quoting Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., 448 F.3d 573, 587 (2d Cir. 2006)); see also Orlander v. Staples, Inc., 802 F.3d 289, 294 (2d Cir. 2015) ("To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii)

10

performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." (quotation marks omitted)).

"In general, '[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan.'" Newmark & Co. Real Estate v. Frischer, 41 N.Y.S.3d 694, 696 (N.Y. App. Div. 2016) (quoting Hall v. United Parcel Serv. of Am., Inc., 555 N.E.2d 273, 279 (N.Y. 1990)); accord O'Grady v. BlueCrest Capital Mgmt. LLP, 111 F. Supp. 3d 494, 502 (S.D.N.Y. 2015); Ott v. Fred Alger Mgmt., Inc., 2012 WL 4767200, at *7 (S.D.N.Y. Sept. 27, 2012). Thus, although the Employment Agreement is the allegedly breached contract, the 2011 Share Plan controls. There is no dispute regarding the existence of a contract—breach and damages are the critical issues.

"Under New York law, which the parties agree is controlling here, the initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties." Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010) (quotation marks omitted). "'Whether or not a [contract] is ambiguous is a question of law to be resolved by the courts.'" Orlander, 802 F.3d at 295 (quoting W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990)). "An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Law Debenture, 595 F.3d at 466 (quotation marks omitted).

"It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four

corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations." In re Coudert Bros., 487 B.R. 375, 389 (S.D.N.Y. 2013). "Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms." Law Debenture, 595 F.3d at 467 (quoting Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989)) (alteration in original).

"As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties." Law Debenture, 595 F.3d at 467 (quoting Hunt Ltd., 889 F.2d at 1277). "Thus, the court should not find the contract ambiguous where the interpretation urged by one party would 'strain [ ] the contract language beyond its reasonable and ordinary meaning.'" Law Debenture, 595 F.3d at 467 (quoting Bethlehem Steel Co. v. Turner Constr. Co., 141 N.E.2d 590, 592 (N.Y. 1957)).

Here, the Employment Agreement states that, "[s]ubject to the terms of the [2011 Share] Plan, the Incentive to Join Share Award shall grant as soon as practicable following the Commencement Date." (Employment Agreement at 000041.) It is unambiguous that "as soon as practicable" relates to the Commencement Date. But it is also unambiguous that the entire clause is subject to the terms of the 2011 Share Plan. And Rule 1.2 gives HSBC the discretion to choose any of Rule 1.3.1's options. (2011 Share Plan ¶ 1.2.) HSBC explains that the only available option is option (ii), "the day after the announcement of the Company's results for any period," and that it makes this choice because certain executives could be privy to non-public information prior to an earnings release, which could impact share prices. (Guzik Decl. ¶ 10.) Thus, in HSBC's opinion, any interpretation of the contract holding that HSBC could have selected a different option would strain the parties' intention. This Court agrees.

While the 2011 Share Plan unambiguously states that HSBC may choose "any of the following" options, only two options could possibly apply—option (ii), which HSBC chose, or option (iii). (2011 Share Plan ¶ 1.3.1.) Option (iii) allows HSBC Directors to grant an award on "any day" if there are exceptional circumstances. The hiring of a single employee among the thousands employed by HSBC is not an exceptional circumstance. Such an interpretation defies both logic and the parties' intent. This is buttressed by the fact that HSBC granted <u>zero</u> restricted share awards before March 2015. (Guzik Decl. ¶ 13.) Thus, the only remaining "practical interpretation" of the agreements is that HSBC would grant the Incentive to Join Share Award pursuant to option (ii), which could not have been earlier than February 23, 2015—a date on which the Award could not have vested before Beach's termination. <u>See</u> <u>In re Coudert Bros.</u>, 487 B.R. at 389. Therefore, HSBC's motion is granted as to the breach of contract claim pleaded in Third Cause of Action.

III. <u>Declaratory Judgment</u>

Beach seeks "a judgment declaring that the . . . grant date of the HSBC plc shares comprising the Incentive to Join Share Award is January 31, 2015." (Compl., ECF No. 1 ("Compl.") at 13.) HSBC argues that this claim is premised on the same theory as Beach's breach of contract claim and should therefore be dismissed. (Mot. at 19.)

"In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Second Circuit has directed district courts to ask the following two questions when determining whether to entertain an action seeking a declaratory judgment: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a

judgment would finalize the controversy and offer relief from uncertainty." Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

Accordingly, declaratory judgment claims that duplicate substantive claims should be dismissed. See EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co., 309 F. Supp. 3d 89, 100 (S.D.N.Y. 2018) ("Plaintiffs' contract claims will necessarily settle the issues for which the declaratory judgment is sought, meaning that the [declaratory judgment] claim[] will serve no useful purpose and will not serve to offer relief from uncertainty." (citations and quotation marks omitted)); Kuhns v. Ledger, 202 F. Supp. 3d 433, 444 (S.D.N.Y. 2016) (dismissing declaratory judgment claim where the relief sought was duplicative of plaintiff's fiduciary duty claim); Myers Indus., Inc. v. Schoeller Arca Sys., Inc., 171 F. Supp. 3d 107, 122 (S.D.N.Y. 2016) (declining to dismiss for lack of jurisdiction because the declaratory judgment claim was not duplicative of breach of contract claims); Catalano v. BMW of N. Am., LLC, 167 F. Supp. 3d 540, 563 (S.D.N.Y. 2016) ("[D]ismissal is warranted where, as here, the declaratory relief [plaintiff] seeks is duplicative of his other causes of action.").

Here, the declaratory judgment and breach of contract claims arise from the same set of facts: Beach did not receive the second tranche of his Incentive to Join Share Award because HSBC terminated him for cause before the shares vested. For the declaratory judgment claim, Beach seeks a declaration that the grant date of the Incentive to Join Share Award was January 31, 2015 because that would set the vesting date before his termination date. (Compl. ¶¶ 36–43.) Were this Court to grant such an order, Beach would naturally receive the second tranche of the Incentive to Join Share Award. For the breach of contract claim, Beach contends that HSBC breached the Employment Agreement by failing to pay out the second tranche of the Incentive to Join Share Award, which he claims vested on January 31, 2016. (Compl. ¶¶ 53–58.)

14

If Beach prevails on this claim, he would receive the second tranche of the Incentive to Join Share Award. In other words, the only difference between these claims is that the declaratory claim relates to the grant date, while the breach of contract claim relates to the vesting date. But because the vesting date is contingent on the grant date, both the declaratory action and the breach of contract claim necessarily turn on the grant date. Beach's counsel conceded as much at oral argument: "THE COURT: But if the breach of contract claim were to go forward, wouldn't that necessarily require, then, a determination as to the grant date? [COUNSEL]: If your Honor believes that . . . then I would say that the declaratory judgment action is unnecessary." (Oral Arg. Tr. at 16:10–17.) In any event, Beach's declaratory judgment claim should be dismissed for the same reasons as his first breach of contract claim.

IV. <u>Breach of Contract/Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Beach's final claim is for breach of contract and breach of the implied covenant of good faith and fair dealing relating to his "for cause" termination. In sum, he argues that either (1) his conduct did not fit within one of the definitions of "cause," meaning that he was not terminated for cause, or (2) HSBC did not exercise good faith in terminating him, in that it manufactured "cause" so that it could avoid issuing the remaining two thirds of the 2014 Bonus Shares and the Incentive to Join Share Award.[3] In addition to disputing these assertions, HSBC

---

[3] Beach also argues that HSBC waived its right to terminate him for the data breach incidents because it did not terminate him immediately after they happened. This argument fails. It is true that "[a]n employer may be estopped from asserting the right to discharge an employee for breach of contract if the employer's behavior condoned the employee' conduct." Kemelhor v. Penthouse Int'l, Ltd., 689 F. Supp. 205, 213 (S.D.N.Y. 1988). But these cases apply when employees are terminated <u>for breach of contract</u> and/or where employers condone employees' bad behavior. See Kemelhor, 689 F. Supp. at 213; Leibu v. Tri-Start Elecs., Inc., 810 N.Y.S.2d 503, 504 (N.Y. App. Div. 2006) (affirming decision to deny summary judgment regarding whether employer waived right to terminate employee because there was "credible evidence that defendants reduced plaintiff's salary due to his alleged misconduct"). Neither applies here. In fact, HSBC warned Beach that his "repeated failure to deal with these issues and respond to REACT is unacceptable. . . . Future issues of poor judgment, dishonest communication, or failure to follow HSBC policies or standards may lead to further corrective action, up to and including termination of employment." (Pl.'s Rule 56.1 ¶ 93.)

15

argues that the implied covenant of good faith and fair dealing does not provide an independent basis for recovery. This is of no moment. Beach does not assert this claim as an independent one under the implied covenant. Rather, he styles it as a breach of contract claim predicated on a breach of the implied covenant.

Thus, the only questions remaining are whether HSBC properly terminated Beach "for cause," and whether that decision was made in good faith. Relying on Welland v. Citigroup, Inc., HSBC argues that an employer's decision to terminate an employee "for cause" is to be given "substantial deference." 2003 WL 22973574 (S.D.N.Y. Dec. 17, 2003). While this is true, courts give deference to "for cause" terminations only "where that term is not defined." Welland, 2003 WL 22973574, at *13.

Here, that term is specifically defined, and "[w]e find no ambiguity in the language of the contract." Cappiello v. ICD Publ'ns, Inc., 458 F. App'x 26, 28 (2d Cir. 2012) (summary order) (holding that, under Illinois law, where an employment contract "clearly specifies the grounds on which [an employee] may be terminated," employer may discharge employee based on those grounds). Thus, Beach's conduct must fit within the Employment Agreement's definition of "cause" for HSBC to properly deny him his awards. See Creditsights, Inc. v. Ciasullo, 2012 WL 12926046, at *2 (S.D.N.Y. Mar. 8, 2012) (explaining that, where employment agreement defines "for cause" and hinges stock cancellation on termination for cause, employer has right to cancel stock upon employee's termination for cause, as defined in the employment agreement); Prudential-Bache Sec., Inc. v. Caporale, 664 F. Supp. 72, 74 (S.D.N.Y. 1987) (holding that an arbitration award did not establish that an employee was dismissed for cause, despite employer's argument to the contrary, because "[t]he most conspicuous gap in" employer's argument was that the basis for employee's dismissal did "not

come within the employment agreement's definition of termination for cause"); Capuano v. Island Comp. Prods., Inc., 382 F. Supp. 2d 326, 338–39 (D. Conn. 2005) ("The more difficult question is whether, on the basis of the undisputed facts in the record, it is proper to conclude as a matter of law that [employer] reasonably based its decision to terminate [employee] on the 'dishonesty' ground set forth in [the 'for cause' definition set forth in the Employment Agreement]. While [employer] had the discretion under the Employment Agreement to decide whether to terminate for cause, much here is disputed about whether Capuano was in fact 'dishonest' in his representations during the interview process.").

HSBC points to two items in the Employment Agreement's definition of "cause": that Beach "(iv) engaged in conduct that materially violated HSBC's internal policies or procedures; . . . or (viii) breached the obligations as set forth in this agreement or materially failed to perform required duties as an employee of HSBC." (Employment Agreement at 000041–42 (quotation marks omitted).) Both of these grounds include the term "materially," and defining such a term is "notoriously inappropriate" on summary judgment. See Leberman v. John Blair & Co., 880 F.2d 1555, 1559–60 (2d Cir. 1989) ("[It] is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." (quotation marks and citations omitted)); see also Johnson & Johnson v. Guidant Corp., 2014 WL 3728598, at *20 (S.D.N.Y. July 22, 2014) ("The determination of [whether a breach of an agreement is material] is a complicated question of fact . . . [and is] especially unsuited to resolution by summary judgment." (quotation marks omitted, alteration and ellipsis in original); Gordon P. Getty Family Tr. v. Peltz, 1998 WL 148425, at *10 (S.D.N.Y. Mar. 27, 1998) ("The disagreement over the materiality of the write-off amount in the investment

17

decision, is a factual inquiry related to the parties' expectations at the time. Such matters cannot be resolved on summary judgment." (citations omitted)).

In addition, HSBC fails to meet its burden on summary judgment. HSBC sets forth three grounds that it claims support Beach's "for cause" termination: (1) Beach's poor communication and that he missed meetings and a training in 2015; (2) Beach failed to respond properly to two data breaches in late 2016; and (3) an investigation spurred by a complaint from Beach's subordinate found that Beach was a poor manager. But HSBC fails to tie these incidents to the definition of "cause." Although the Corrective Action Form lists various policies and provisions, it is unclear exactly how Beach's conduct constituted a violation, and HSBC sets forth no argument for how such violations were material, or how Beach materially failed to perform required duties.

Indeed, with respect to the first incident in 2015, HSBC came to the ultimate conclusion that Beach was "on track" and a "good" employee. A rational trier of fact could find that such conduct did not warrant termination. As for the data breaches, while this Court is not persuaded by Beach's waiver argument, HSBC chose only to place Beach on "written performance warning," and Beach never had an issue with REACT after that. (Pl.'s Rule 56.1 ¶ 92.) Finally, with regard to the investigation into Beach's management, Beach offers the plausible theory that HSBC was trying to terminate him before his shares vested. Thus, there are genuine disputes of material fact as to whether Beach <u>materially</u> violated HSBC policies or failed to perform his required duties and obligations.

Moreover, Beach argues that, even if his termination properly fit into one of the definitions of "cause," HSBC manufactured those reasons and thus violated the implied covenant of good faith and fair dealing. In other words, he argues that HSBC retroactively and arbitrarily

18

cherry-picked incidents which it now claims violated company policy. "Under governing New York law, the determination as to whether a termination was for cause requires substantial deference to the employer's good-faith decision." Tischmann v. ITT/Sheraton Corp., 1997 WL 195477, at *3 (S.D.N.Y. Apr. 22, 1997). "What 'good faith' requires varies on a case-by-case basis: 'the boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract.'" Gas Nat., Inc. v. Iberdrola, S.A., 33 F. Supp. 3d 373, 383 (S.D.N.Y. 2014) (quoting Cross & Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989)).

"In determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties. Thus, whether particular conduct violates . . . the duty of good faith and fair dealing . . . is ordinarily a question of fact to be determined by the jury . . . ." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007) (quotation marks and citation omitted). Indeed, "summary judgment is ordinarily inappropriate where intent and state of mind are at issue." Leberman, 880 F.2d at 1559–60; see also W.W.W. Pharm. Co. v. Gillette Co., 1989 WL 206492, at *1 (S.D.N.Y. Dec. 5, 1989) ("[W]e observe that subjective issues such as good faith are singularly inappropriate for determination on summary judgment.").

Beach sets forth "specific facts showing that there is a genuine issue for trial" as to whether HSBC's justifications were manufactured. Anderson, 477 U.S. at 249 (citation and quotation marks omitted). First, as discussed above, after the first incident, HSBC still viewed Beach as a "good" employee, and after the second it chose only to give him a warning, demonstrating that it had no intention of terminating his employment. Second, he contends that

19

HSBC was slimming down its compliance department and thus wanted to terminate Beach before his shares vested. Indeed, HSBC concedes that "[t]he budget for [it]s compliance department was reduced by approximately $5,000,000 from 2016." (Pl.'s Rule 56.1, Statement of Additional Facts ¶ 6.) Third, contrary to common practice, Brown held a "Skip Level Exchange Meeting" without notifying Beach. (Brown Dep. Tr. at 204:5–10.) As such, there are genuine disputes of material fact as to whether HSBC acted in good faith when it terminated Beach.

## CONCLUSION

For the foregoing reasons, HSBC's motion for summary judgment is granted in part and denied in part. Beach's breach of contract claim (Third Cause of Action) and his declaratory judgment claim (First Cause of Action) are dismissed. The parties are directed to appear for a status conference on September 13, 2018 at 11:00 a.m. The Clerk of Court is directed to terminate the motion pending at ECF No. 34.

Dated: August 21, 2018
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.